Good morning, Your Honors. Devin Terrio Orr, may it please the Court, for the petitioner Eric Olivares-Calixto. I'd like to reserve two minutes for rebuttal. And if you could keep your voice up, that would be helpful. Thank you. This case concerns a preliminary screening procedure that is implemented by the Department of Homeland Security in order to comply with the United States government's obligations under certain international conventions, including both the Torture Convention and the 1968 Protocol relating to the status of refugees. The screening process requires that the applicant meet a relatively low threshold of establishing a reasonable possibility that, at a full hearing, they could win relief on one of their protection claims. Because Mr. Olivares has established at least a reasonable possibility of meeting his burden of proof, the Court should grant the petition and remand with instructions that withholding-only proceedings be initiated. I'd like to start by discussing the standards that should be applied to reasonable fear claims by the agency and then discuss the withholding claims and the CAT claims. So this case provides an opportunity for the Court to provide much-needed guidance to the agency on these types of cases, which are increasingly flooding the Court's docket. There's a dearth of guidance right now from the Court, although there have been several cases recently, including Martinez v. Sessions, which I filed a 20HA letter on on Friday. And essentially, I think one of the problems is that the lack of any sort of appellate review within the agency means that we only get one level of administrative review before the Immigration Court, before the cases are kicked up to the Ninth Circuit. So, consistent with U.S. government's obligations under international law, the reasonable fear process should be interpreted generously to provide relief to individuals who fear return, fear harm upon return to their country. This one's a tricky one for me because I don't see any facts, even as alleged and then construed quite strongly in your favor, that even gets him very close. So what do I do? Are you going to try to persuade me that actually he has facts that entitle him to some sort of protection? Because Pacho, there's nothing there. Pacho, I'm not sure how to pronounce it. There's nothing there. Gang member, I mean, what's the protective ground? Well, Your Honor, I think that with respect, the cases that the court has previously addressed gang member claims are quite distinguishable from the case at Barr in that they involved individuals who had not attempted to relocate to multiple places. And, you know, what we have here is an individual who first lived very briefly in Altar. There was an attempted kidnapping there, crossed the border, was returned, and then decided he wanted to make a go of living in Mexico this time and not try to violate our laws again, moved to Hidalgo, lived with family there, and was almost immediately threatened with kidnapping. No. I wish I were in this job allowed to act on my sympathies. I'm sympathetic. But where is there in our case law a protected ground? Well, I mean, I think, again, the fact that he is readily identifiable because of his tattoos as a former gang member. And I think that this is not a situation where, like in Artiega, where the individual was still a gang member. This is somebody who has distanced himself from his gang affiliations and really tried his very best in Mexico to steer clear of any problems, and yet he's faced with this double bind. He cannot go to his former gang associates for protection because he's left the gang, and yet his tattoos identify him as a gang member. So, you know, I think, with respect, that this case is distinguishable from the other gang cases that the court has considered, particularly because of his status as a former gang member. And, you know, the court's decision in Artiega, to the extent that it could be read, as I think the IJ read it, as a carte blanche, former gang member equals no social group, that's clearly not the position of the agency in MEVG. And this is in the briefs, but, you know, basically the agency made it very clear when it decided MEVG that gang cases have to be analyzed on a case-by-case basis. It's not, the agency has never taken the position that you cannot make a social group claim out as a former gang member. That's not the agency's position. So to the extent that the court took that position, you know, the court would be invited under Brand X to reconsider it, given that the agency subsequently clarified that, in fact, you know, gang cases do need to be analyzed in their facts. And here we have, you know, two different very well-qualified experts who opined that, indeed, he would face harm if returned. And, again, we're at this preliminary screening process. And, you know, I would much rather be up here with a full record after going to the board and having a full hearing where the department would have the opportunity to cross-examine my client and, you know, maybe he would get relief, maybe he wouldn't. But the issues would likely be very different. But at this preliminary stage, the court should be encouraging the agency to accept and adjudicate claims. And then, you know, in the event that they don't win on the merits, then that's a different issue. But, you know, at this preliminary screening stage, we need to be leaning heavily in favor of protection. As I think about the question, there are ways the immediate and precise question in front of us, and that is should there be a more elaborate hearing process. As I hear it, really, the question on which you're claiming at least some possibility of relief is not so much factual. I doubt the facts are going to be very much disputed. It's going to be, can I get a modification of the case law? So it's not a hearing. Ordinarily, you want a hearing to establish the facts. Here, you want a hearing because you're trying to nudge the law a little bit. Right. I mean, I think that, and again, this is one of the areas where it's troubling as an advocate that we have no power to go to the board and seek the board's input and advice on these types of issues. Because, you know, again, the IJs definitely overwork. They see a lot of cases, and I understand that they have, you know, huge caseloads and completion goals and whatnot. But that said, you know, in this case, I don't believe that the immigration court responded to our arguments, you know, in any meaningful way. I mean, we provided pretty clear briefing on our arguments about why these cases were distinguishable, and the court's reaction was, cite the cases you lose. And that shouldn't be enough when you're dealing with someone's life. That's our position. And just on the standard, I just want to briefly mention that, and this was an argument that I want to credit one of the co-counsels, one of the counsels on the cases that's been submitted on the briefs, because we did talk before the argument. And in her brief, she pointed out that the review that the IJ should be doing here is not only de novo, but it's de novo on an open record. And that's very clear if you look at other cases interpreting similar types of regulatory provisions. One example would be if somebody is seeking conditional residence to have the conditions on residence removed. They, you know, have a marriage-based case, and they're married less than two years, they have to remove those conditions. And if their waiver to remove the conditions is denied, and they go before an IJ, that's called review in the language of the regs. And the BIA, in matter of Herrera del Orden, that's 25 INN Decision 589 and the Penn Cites 592, construed review to mean not only de novo review of the agency's decision, but additionally the ability to accept new evidence. So, and certainly here, when we have law, you know, a legal argument, you know, I think that at a minimum, Mr. Olivares should have the opportunity to have a decision on his claims. And I just want to briefly, if I may, discuss the Catt claim, because I think that that's another aspect that doesn't require, you know, an access to a protected ground. And here again, we have, you know, two expert statements, both opining that he's at risk of harm. You know, he's had death threats. He's had both two threats of kidnappings. And again, that should be enough to give him a hearing on his claim. So, and I'm forgetting if the time is my total time or my time left on rebuttal. You've got 50 seconds left. Of my 10 minutes. Of your 10 minutes. Okay, I'd like to reserve the balance. But we'll make sure you get a chance to say what you need to say. Thank you, Your Honor. Let's hear from the government. Good morning, Your Honors. May it please the Court. Leslie McKay for the Attorney General. Your Honors, we're here today and Mr. Olivares is at this stage of his proceedings because he's been removed and illegally reentered three times. So he is now in this screening process, these reasonable fear proceedings that have been established by Congress to ensure that we're complying with the country's obligations under the Convention Against Torture and our non-refoulement obligations. So the standard that the agency uses, and this is clear in the interim rule for the Convention Against Torture, which we cite in our briefs, the standard is a reasonable possibility that he would be persecuted or tortured. And that makes sense. It is a screening process. It is sort of a lower threshold than would be applied in a full-blown merits withholding or CAT hearing. However, it's a screening process to determine sort of facial eligibility for withholding and CAT, and both of those carry a higher burden of proof than asylum. So he does have to meet a fairly significant threshold burden, more significant than aliens, let's say, in credible fear proceedings, where they would also be eligible for asylum. In reasonable fear proceedings, the only relief possible is withholding and CAT, and those forms of relief carry with them a higher burden. Here, the immigration judge reasonably held that he didn't meet his burden. His particular social group, Americanized male recent gang apostates, is not cognizable. That's fully consistent with this Court's case law, and there's nothing in the record, in the factual record, that really takes this case out of that umbrella of case law that this Court has established. There really aren't boundaries on this group. What does it mean to be Americanized? Recent. What does apostasy mean? He says at various times he's distanced himself from the gang. He says he's not a gang member. His expert, one of his experts at one point, says he wants to quit the gang. So it's not clear who's in that group, why they would be recognized by Mexican society as a group. So I think in that sense, the immigration judge's decision is perfectly reasonable. I don't see anything here that compels, would compel the Court to reverse that. What type of gang member would the agency recognize as a particular social group? Is there any type of current or former gang member that could be a member of a social group? I don't think that there is any case law, or I haven't seen any. Now, bear in mind, the only cases that I see and the only cases the Court sees are ones where the adjudicator has said no. So I presume that there are cases out there, there are gang cases out there that have been successful, and we simply don't know about them because they don't wind their way up through the process to us. So I don't think that the existing case law really is helpful. What about the Bureau's interpretation of the regulations? Do they allow for any former gang members to be members of a social group? Right now, the case law would certainly suggest no. I think that there is some circuit law, and this would be really in the context, when you're talking about former gang members, often you're talking about immutability, that once you're a former member, you can't undo that. You're always in that group. Now, the Court did say in Artiega, just because you leave one group doesn't mean you automatically place yourself into another group. So the case law isn't entirely consistent on that point. I don't think that's helpful, though, here. That immutability discussion isn't as helpful here. Even if we assume that he, that by being a former gang member, if we assume he has quit the gang and that that is an immutable characteristic, I still think he has problems with particularity and social distinction. And really, it's not just, it's because his social group isn't just about the gangs. It's also about being Americanized. It's also about being tattooed. It's also about being a recent apostate. He amalgamates these characteristics in an attempt, I think, to narrow his group down, but it doesn't take him out from under this umbrella of case law that really says these characteristics. So how are we supposed to articulate the standard by which we can allow this sort of, I'll call it kind of screening reasonable fear interview, as distinct from a full-fledged hearing, then with the possibility of going up to the board and getting a decision on the merits, which we can then review here? When, I'll try to make this clean for the moment, let's assume totally undisputed facts and the question is one of law, and it looks like a loser on the law, but it's not frivolous. Are you, is the government saying that we can deprive this person of going before the board to get a decision that's then reviewable by us on a non-frivolous legal claim? I'm saying that that's the process that Congress has established for aliens in this limited category of cases. And when you say limited category, how do you, what do you mean by that? So reasonable fear proceedings are for aggravated felons and illegal re-entrants. And so you, so he's already had a full removal hearing. That happened in 2010. And now, you know, we're sort of three steps past that, many years past that, following multiple illegal re-entries. And so it does make more sense to have a truncated procedure. He did have two separate adjudicators consider everything he wanted to put in. And if you look at the transcript, the immigration judge here I think really did a great job. He offered to continue the case to allow for the witnesses, the expert witnesses to tell, excuse me, to testify telephonically. And instead of taking that option, which is fine, Mr. Olivares decided to put in the declarations. When he came back for his hearing, the immigration judge says on the record, I've considered your expert witnesses. I've considered your declaration. I've considered your briefs. Are there any more arguments? I've considered all your evidence. Are there any more arguments that you want to present? And counsel said no. So he could have made an argument at that point. I think he could have called Mr. Olivares to testify if he wished to do so. So I think there was that opportunity to create a fuller record that wasn't taken. And I'm not sure that really that that was necessary. I think this is a case where there are plenty of facts with the declarations that are already in the record. But he did have that opportunity to have more of the type of hearing that we're used to seeing in these immigration cases and maybe more of a type of hearing that makes us all feel a little bit better because the record is more fulsome and we have more to work with. I completely agree with counsel. These records are not the best for us either. There's not as much in there as I want to be in there. But I think that this is a case where there's enough in there that the court can be satisfied that he had all the process that he was due and that nothing in his evidence really compels a reversal of the immigration judge's decision on withholding or on CAT. The CAT piece of the puzzle does take out the problems with the social group, but you still have essentially a speculative claim. And the IJA did point to the fact that Mr. Olivares has been and spent time in Mexico and has been harmed or threatened with harm, but hasn't faced torture. So I think there's enough here with all of that for the court to sustain this immigration judge's decision and deny the petition for review. If there are further questions, I'm happy to answer them. Thank you very much. Would you like time for response? I'm sorry? Would you like time for response? I think that was a rhetorical question. Yes, I would. Thank you, Judge. So I guess I want to start just briefly mentioning something that I actually located when I was preparing for arguments yesterday, which is a training course that was actually publicized, I think, via FOIA. And it's a memo from John Lafferty, the chief of the Asylum Division, and I'll be happy to do a 28-J with it when I get back to the office. But essentially, I want to just correct the record on one thing, because, you know, counsel said that there is a 51 percent requirement for proving your case if you get to an IJA on a CAT claim or on a withholding claim. Absolutely true. But at the screening stage, it's a 10 percent likelihood of success. So it's not a higher standard. It's a low standard at this stage. And then, you know, once you get to the actual IJA hearing, yes, then you have to prove it's more likely than not that you would be tortured. But at this stage, again, the training materials make clear that reasonable possibility is a lower standard intended to allow these claims to get to an IJA. They basically want to screen out, in my view, how I would like these to work, is to screen out clearly frivolous claims. And, you know, if someone's claiming the prime minister of Canada is going to, you know, come into the room and attack them, that's a clearly frivolous claim that should be screened out. What do we do with that? Meaning your client has an opportunity to say, well, the following things have happened to me. I fear that the following things will happen to me. And if we take all of those statements and say, well, there's nothing there that rises to the level of torture under CAT, how is there any possibility of even getting to 10 percent? Well, I mean... Are you saying that the 10 percent includes evidence that might be forthcoming beyond what's alleged? Well, with respect, I think that the record does establish a 10 percent chance. I mean, I think that, you know, we shouldn't require people to be kidnapped and have, you know, tortured and killed before they're able to get a claim for relief. And, you know, in this case, he was successful in evading kidnapping on multiple occasions. And that's great. But we shouldn't force him to go back and actually be kidnapped before he's eligible to have his claim heard. And just one last thing, if I may. I know my time's almost up here. On page 17 of my opening brief, I do cite two cases from the Fourth and Sixth Circuit, both involving former gang members, and both, you know, remanding the claim and granting the petition. So, you know, these claims do get granted, at least in other circuits. So with respect, I would ask the Court to grant the petition. Okay. Thank you. Oliveros Calixto versus Sessions, submitted for decision. Thank you for your arguments.
judges: Fernandez, W. Fletcher, Melloy